IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 12-75 |
| | ) | Judge Nora Barry Fischer |
| DAVID JAY HADDIX, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a Motion to Suppress Evidence filed by Defendant David Jay Haddix (hereinafter "Defendant") on February 15, 2013.[1] (Docket No. 69). Defendant seeks to suppress statements allegedly made by him on June 7, 2011 during police questioning that followed the execution of a felony traffic stop. (*Id*.). These statements relate to Defendant's possession of firearms which had been seized by Pittsburgh City Police pursuant to a search warrant executed at his mother's residence on June 1, 2011. (*Id*.). Defendant claims the questioning violated his rights under the Fifth and Sixth Amendments on the grounds that: (1) Defendant was not provided his *Miranda*[2] warnings; (2) Defendant did not knowingly and intelligently waive his Fifth Amendment right to remain silent and his Sixth Amendment right to have counsel present during police interrogation; and (3) any alleged waiver of his *Miranda* rights was not voluntary. (*Id*.). The Government opposes Defendant's motion, asserting that the involved officers read Defendant his *Miranda* rights, and Defendant indicated that he understood those rights prior to voluntarily waiving them. (Docket No. 70).

---

[1] The Court notes that Defendant has also filed three additional pretrial motions which remain pending before the Court, i.e., his: Motion to Produce Rule 404(b) and 609 Evidence (Docket No. 66); Motion for Discovery (Docket No. 67); Motion to Preserve Law Enforcement Rough Notes (Docket No. 68). The Court will issue separate orders setting forth the disposition of these motions.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1

A suppression hearing was held on March 26, 2013. (Docket No. 77). The transcript of the hearing has been produced and was fully considered by the Court. (Docket No. 79).[3] The Court also ordered the parties to submit proposed findings of fact and conclusions of law. (Docket No. 78). On May 28, 2013, both the Defendant (Docket No. 81) and the Government (Docket No. 80) submitted their Proposed Findings of Fact and Conclusions of Law. Accordingly, this motion is ripe for disposition.

Upon consideration of all of the parties' submissions, the evidence presented during the motion hearing and for the following reasons, Defendant's motion to suppress [69] is denied.

## II. BACKGROUND

### A. Charges and Potential Penalties

Defendant was charged by Indictment with one count of possession of a firearm or ammunition by a convicted felon on or about June 1, 2011, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Docket No. 1). The indictment alleges that Defendant knowingly possessed the following firearms: (1) HiPoint rifle; (2) Marlin rifle; (3) Winchester shotgun; (4) J.C. Higgins shotgun; (5) Remington shotgun; (6) Remington rifle; (7) Mossberg shotgun; (8) Mossberg rifle; (9) Remington rifle; (10) Kessler Arms shotgun; and (11) Ithaca rifle, having been convicted on or about November 21, 1997 of the felony, Possession with Intent to Deliver a Controlled Substance. (Docket No. 1). A conviction at Count One carries a potential term of imprisonment of no more than ten years. 18 U.S.C. § 924(e). However, if Defendant has three previous convictions for a violent felony or serious drug offenses, then the term of imprisonment is not less than fifteen years to a maximum of life imprisonment. (*Id.*).

### B. Findings of Fact[4]

---

[3] Future citations to the Transcript filed at Docket No. 79 shall be referred to as "Tr. at _".
[4] It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are

2

The credible evidence offered at the March 26, 2013 suppression hearing establishes the following facts. Three officers from the Narcotics Division of Pittsburgh Bureau of Police initiated the arrest of Defendant: Sergeant Douglas Epler;[5] (Tr. at 14-74), Detective Joseph Lewis;[6] (Tr. at 76-138), and Detective Michael Reddy.[7] (Tr. at 154-171). These three officers had been involved in the investigation and actual search of Defendant's residence at 1309 Sherman Avenue in the North Side of Pittsburgh on June 1, 2011, which resulted in the issuance of a warrant for Defendant's arrest. (Tr. at 15-16, 78, 155). Defendant's mother, Eileen Haddix, was the only individual at the residence during this search. (Tr. at 17). Detective Lewis was the evidence custodian and confirmed that the search yielded the seizure of three marijuana plants, drug packaging materials, twenty-three firearms and indicia of Defendant's residence at that address. (Tr. at 78).

On June 7, 2011, these officers were working undercover on an unrelated matter, in plain-clothes and driving in an unmarked car. (Tr. at 33-34). Aware of Defendant's outstanding warrant, they decided to drive by his residence, and when they noticed Defendant's truck parked in the driveway, they decided to wait and observe. (Tr. at 18, 79, 157). Once Defendant returned to the truck and pulled away, the officers followed and radioed for a uniformed officer to execute a felony traffic stop, because their car was devoid of police markings, equipment and did not have that capability. (Tr. at 18, 158). Officer Able[8], another Pittsburgh Policeman, was nearby

---

all matters to be determined by the trial judge." *United States v. Hill*, Cr. No. 07-371, 2008 WL 2367185, *5 (W.D. Pa. 2008) (quoting *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D.Pa. 2007) (citations omitted)).

[5] Seargant Epler had been with the City of Pittsburgh Police Department for twenty years. (Tr. at 14). He had been a sergeant in the narcotics unit since 2001. (*Id.*).

[6] Detective Lewis has been with the City of Pittsburgh Police Department since 2000. (Tr. at 77). He has been a uniformed officer for two years and has been an undercover officer with the narcotics investigation unit since 2002 other than a four and a half year assignment with the Bureau of Alcohol, Tobacco and Firearms. (*Id.*).

[7] Detective Reddy has served with the Pittsburgh Police Department for thirteen years. (Tr. at 154).

[8] Officer Paul Able was also called to testify. (Tr. at 140-154). He has been with the City of Pittsburgh Police Department since May 15, 2001. (Tr. at 140).

and responded to the scene. (Tr. at 35). He triggered his emergency lights and Defendant immediately complied by pulling his vehicle over to the side of the road. (Tr. at 81, 160). The team pulled behind Defendant's truck, with the Detectives' undercover vehicle stopped behind him. (Tr. at 35). This stop occurred at approximately 8:45 p.m., while still daylight and in a well-lit area where traffic was not impeded. (Tr. at 21-22).

Through his vehicle's PA system, Officer Able instructed Defendant to: turn off the car; place the keys on the roof; place his hands behind his back; and walk backwards away from the truck towards his police car. (Tr. at 20, 143). Defendant was then ordered to the ground, at which point Officer Reddy hand-cuffed Defendant before pulling him to his feet. (Tr. at 85, 162-163).[9] During this time, the plain-clothed officers had their guns drawn because Defendant was considered dangerous, due to their awareness of his arrest warrant for a felony firearm offense. (Tr. at 20, 82, 120). Defendant's girlfriend was also in his truck and was taken into custody through the same procedure. (Tr. at 21). Throughout the duration of the stop, a total of nine officers, including the four previously identified officers, arrived on the scene in police vehicles. (Tr. at 35, 95-96). Additional officers routinely arrive on the scene and draw their weapons when the subject of the arrest warrant is known to possess firearms as an additional safety precaution. (Tr. at 35, 80, 144, 161, 164). Once the Defendant was taken into custody, the officers no longer had their guns pointed at Defendant. (Tr. at 120).

Sergeant Epler was the first person to question Defendant (Tr. at 22), approximately five minutes after the initial stop. (Tr. at 54). Detective Lewis testified that as Sergeant Epler was pulling out his *Miranda* rights card, before being asked any questions, Defendant immediately told the officers that he knew there was an existing arrest warrant out for him and understood

---

[9] A search incident to arrest revealed Defendant in possession of a controlled substance, Oxycodone and $176. (Tr. at 130-131)

4

why he was being taken into custody. (Tr. at 84). Then using the *Miranda* Rights card that he kept in his badge at all times around his neck, Sergeant Epler read Defendant his rights as set forth on the card.[10] (Tr. at 23, 86). Sergeant Epler and Defendant then sat on the curb and spoke for approximately ten minutes. (Tr. at 30-31, 91). Defendant spoke with the Sergeant about hunting, various weapons, specifically bow hunting, in what was described as a "friendly conversation." (Tr. at 133-134). Officer Lewis testified that he was standing nearby and overheard the entire conversation and confirms same. (Tr. at 86). Sergeant Epler and Officer Lewis believed that Defendant had comprehended his rights. (Tr. at 26-27, 88). Defendant answered affirmatively that he wished to speak with Sergeant Epler. (*Id*.). During this interaction, the officers did not believe Defendant was coerced or threatened by any officer. (Tr. at 26, 88). At no time did Defendant express any indication that he did not understand anything, nor express any interest in speaking to an attorney. (Tr. at 28, 90). By all accounts, Defendant was extremely calm, pleasant, polite, personable and likable during his arrest. (Tr. at 26, 30, 89, 91).

The officers did not possess nor supply Defendant with a waiver of rights form to sign.[11] (Tr. at 47-49, 117-118). Officers typically do not use a waiver form on the streets because such arrestees are handcuffed behind their backs. (Tr. at 122). Hence, they cannot physically sign a form. (Tr. at 122). They did not immediately take Defendant to the police station even though it

---

[10] A picture of each side of this card was submitted into evidence as Government Exhibit A. (Tr. at 25). The card was read into evidence as follows:
> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you free of charge before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions or make any statements. And flipping it over, it's: Do you understand what I -- the rights I've explained? Having these in mind, do you wish to speak to us?

(Tr. at 26).

[11] Defense counsel introduced an Alleghey County Police Waiver of Rights form to provide the testifying officers an example of a Waiver of Rights Form. (Tr. at 45).

5

was only a mile away. (Tr. at 125). Instead, they elected to stay at the scene until another individual was able to pick up Defendant's truck, as a courtesy for his cooperation and so that he would not be forced to pay for towing. (Tr. at 126).

Officer Abel's testimony regarding the felony traffic stop was consistent with that of the other officers, (Tr. at 140-144), except he was not standing nearby when Officer Epler spoke with Defendant and did not hear the substance of their conversation. (Tr. at 145). Officer Abel did drive Defendant to the station, and reaffirmed Defendant's overall compliance with instructions and appropriate demeanor. (Tr. at 150).

### III. DISCUSSION

In his motion to suppress, Defendant first argues that his statements after the execution of the arrest warrant were obtained unlawfully because he was subject to a custodial interrogation without having first been advised of his constitutional rights. (Docket No. 69 at ¶ 22). Hence, Defendant seeks to suppress his post-arrest statements that "he was stupid for still having them," in reference to the seized guns and that he enjoys hunting and had recently done so with a crossbow. (*Id*. at ¶¶ 14, 15). Additionally, Defendant argues there was no valid waiver of his *Miranda* rights because he was not provided a waiver of rights form nor did he sign any written waiver. (*Id*. at ¶ 22). As such, Defendant alleges he did not understand his rights. (*Id*. at ¶ 26). Defendant further avers that the circumstances of being questioned on the street in the presence of multiple officers, was inherently coercive and given same, he did not voluntarily waive his rights. (*Id*. at ¶ 27).

The Government responds that there is sufficient evidence to prove that the officers read Defendant his *Miranda* rights and that Defendant voluntarily answered questions before making the challenged statements. (Docket No. 70 at 2). Additionally, the Government contends that

Defendant's age and experience from being previously arrested are indicative of his familiarity and knowledge of his *Miranda* rights. (*Id*.). Last, the Government argues that Defendant's curb-side interrogation did not coerce Defendant into an involuntary waiver of his rights. (*Id*. at 5).

    A. *Was Defendant Read His Miranda Rights?*

Defendant claims that his statements regarding his possession of firearms and recent participation in hunting while being questioned are inadmissible because they resulted from a violation of his *Miranda* rights. (Docket No. 69). The Supreme Court has determined that a suspect must be given specific warnings of his Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* specified these rights as follows: "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479. The Court further explained "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. Additionally, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

It is evident that after executing the felony arrest, Defendant was subject to a custodial interrogation triggering his Fifth Amendment rights. The Government does not argue to the contrary. (Docket No. 80 at ¶ 29). While several officers had their guns pointed, Defendant was ordered to the ground and apprehended. (Tr. at 162-163). He was then asked questions while sitting on the curb with his hands cuffed behind his back. (Tr. at 30-31, 91). Moreover, Sergeant

7

Epler stated as such, testifying that Defendant "was taken into custody without incident," (Tr. at 21), and that he had been "the first person to ask him questions." (Tr. at 22-23).

Therefore, Defendant was entitled to be informed of his *Miranda* rights prior to any police questioning, otherwise; his statements should be suppressed. Defendant argues that because there was not a waiver of rights form or other express written waiver by Defendant, there is insufficient proof that he had been given his *Miranda* rights. (Docket No. 69 at ¶ 25). However, there is no obligation by officials to supply a defendant with a document providing the *Miranda* warnings. Questioning does not occur exclusively at the police station and "the officer in the field may not always have access to printed *Miranda* warnings." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). The Supreme Court has specifically held that they "have never insisted that *Miranda* warnings be given in the exact form described in [the *Miranda*] decision." *Id.* at 202. There is no exact form the *Miranda* warnings must take, so long as the "warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'" *Id.* (quoting *California v. Prysock*, 453 U.S. 344, 361 (1981)).

The Government has established through the officers' testimony and related evidence that Defendant was read his *Miranda* rights prior to the custodial interrogation. Sergeant Epler testified that he read Defendant his *Miranda* warnings from the card that he carries, (Tr. at 23), and Detective Lewis testified that he witnessed and overheard this entire exchange. (Tr. at 86). Further, Sergeant Epler stated that the only item he keeps on him at all times as an undercover officer is his badge, and it is his practice to keep the card tucked in his badge for occasions such as this. (Tr. at 23-24). Based upon their individual experience, background and demeanor while testifying, the Court found all of the officers' testimony credible. Hence, the Court rejects

8

Defendant's argument that he was not read his *Miranda* rights prior to making his declarations regarding his possession of the firearms.[12]

Having found that Defendant was informed of his *Miranda* rights, Defendant's statements could only be suppressed if he did not understand or voluntarily waive his rights. The Court now turns to this argument as raised by the Defendant.

B. *Did Defendant Understand His Rights and Voluntarily Waive Them?*

Defendant asserts that he did not knowingly and intelligently waive his rights and that based upon the totality of the circumstances, his waiver should be considered involuntary. (Docket No. 69 at ¶ 24). It is the Government's burden to establish that the defendant "'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement," by a preponderance of the evidence. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010) (*citing North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). The waiver inquiry has "two distinct dimensions:" it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" and "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Fahy v. Horn,* 516 F.3d 169, 194 (3d Cir. 2008) (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

   a. Knowing and Intelligently

Defendant claims that there is insufficient evidence to prove that he knowingly waived his *Miranda* rights. Primarily, Defendant contends that because he was not given a written

---

[12] Defendant's only statement made prior to being advised of his rights was that he understood the reason for his arrest (Tr. at 84), but Defendant does not argue against the admissibility of this statement.

9

statement of his rights, he did not have a valid understanding of the rights which he was giving up. (Docket No. 69 at ¶ 26). The Government responds that testimony adduced at the hearing reveals that Defendant stated that he understood his rights and affirmatively waived such rights. (Docket No. 70 at 4).

The Supreme Court has already concluded that no requirement exists that a defendant be given written *Miranda* rights. *See Duckworth*, 482 at 203. Similarly, "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." *Butler*, 441 U.S. at 375-76 (1979). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id*. at 373. The Third Circuit Court of Appeals has since examined the issue of whether a defendant can implicitly waive their *Miranda* rights if the defendant was not given a written *Miranda* warning and did not sign a Waiver of Rights form in *United States v. Velasquez*, 626 F.2d 314 (3d Cir. 1980). In *Velasquez*, the defendant's statements were not suppressed after the court found that "[defendant]'s subsequent willingness to answer questions after acknowledging that she understood her Miranda rights is sufficient to constitute an implied waiver under *Butler*." 626 F.2d at 320. The Court determined that the Government overcame the presumption against waiver through the testimony of one officer who stated that he read the defendant her *Miranda* rights and the defendant responded that she understood.[13] *Id*.

---

[13] The entirety of the officer's testimony that was necessary to establish the defendant's implicit waiver was cited in the opinion as follows:
Q. O.K. When you were reading her her rights, did she give you responses?
A. Yes.
Q. And what were her responses?
A. That she understood what I was telling her.
Q. And what else?

Here, the Government introduced the testimony of two officers, Sergeant Epler and Detective Lewis, who both stated that Sergeant Epler read Defendant his *Miranda* rights, (Tr. at 23, 86), and Defendant subsequently agreed to speak with Sergeant Epler. (Tr. at 26-27, 88). As previously stated, there is no reason to doubt the veracity of the officers' testimony. The Court has found them to be credible witnesses. Therefore, the fact that Defendant was not provided a Waiver of Rights Form is not indicative of Defendant's alleged lack of knowledge of his *Miranda* rights. Rather, Defendant's willingness to answer questions following his acknowledgment of his *Miranda* rights is sufficient for this Court to conclude that Defendant knowingly and intelligently waived his rights.

    b. *Voluntarily*

Defendant contends that the waiver of his *Miranda* rights was involuntary and the product of police coercion. (Docket No. 69 at ¶ 27). He alleges that a roadside interrogation with an overwhelming number of police present with their weapons drawn is so inherently coercive that it renders his statements involuntary. (*Id*.). The Government responds that the officers' actions were routine and they did not apply any physical or psychological pressure to coerce Defendant into making the statements he made. (Docket No. 70 at 5).

The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante,* 499 U.S. 279, 288 (1991). Courts must look at "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). When viewing the totality of the circumstances, the Supreme Court has

---

    A. That's all as far as the rights were concerned.
*United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980).

11

identified "some of the traditional indicia of coercion: 'the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control.'" *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citing *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). The Third Circuit has also specified that additional circumstances to consider include the "suspect's background and experience, including prior dealings with the criminal justice system," *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005), as well as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) (citing *Withrow v. Williams,* 507 U.S. 680, 693 (1993) (some internal citations omitted)).

Based upon the "totality of the circumstances" surrounding Defendant's arrest, there is no traditional indicia of coercion present. First, the accused has been convicted of a felony, (Docket 1), establishing that Defendant has experience with the criminal justice system. Next, the felony traffic stop, as executed by the officers, was conducted consistently with the proper practice of such stops. (Tr. at 35, 37, 80-82, 142-144). Once the Defendant was in custody, officers reholstered their weapons and no longer pointed them at him. (Tr. at 54, 120). Then, after only about a five minute span, (Tr. at 54), Sergeant Epler spoke to Defendant individually for approximately ten minutes while sitting down on the curb. (Tr. at 30-31, 91). No coercion was demonstrated; rather, as the Court heard, Detective Lewis testified that it was "almost weird" because it was a "friendly conversation . . . like almost a social environment." (Tr. at 133).

Defendant argues that the acting police officers' actions were inherently coercive, citing the Supreme Court decision in *Ashcraft v. Tennessee,* 322 U.S. 143, 154 (1944). (Docket Nos. 69 at ¶ 27; 81 at ¶ 48). In *Ashcraft*, it was determined that a thirty-six hour interrogation of a murder

12

suspect in a room within the County Jail was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear." 322 U.S. at 154. The circumstances of *Ashcraft* and Defendant's arrest are remarkably different. *Ashcraft* was a grueling thirty-six hour ordeal, while Defendant was engaged in what has been described as a friendly conversation for a total of approximately ten minutes. (Tr. at 30-31, 91). Defendant also argues that a "small army" of officers yelling orders and pointing their weapons were the sources of coercion. (Docket No. 81 at ¶ 48). However, testimony at the hearing clarified that Officer Able was the singular individual giving orders for the traffic stop (Tr. at 143), and only Sergeant Epler spoke with Defendant, once he was apprehended. (Tr. at 22). Additionally, the officers knew that Defendant's arrest warrant was for a firearm offense, so they were unsure whether he could be dangerous. (Tr. at 79, 157). Consequently, it was not out of the ordinary that several officers arrived at a felony traffic stop and had their weapons drawn as the defendant was taken into custody. (R. at 35, 37, 80-82, 142-144).

Based upon the totality of the circumstances, the Court finds no indicia of coercion present during Defendant's waiver of his *Miranda* rights for the Court to determine that his waiver had been involuntary. As his waiver was made knowingly and voluntarily, Defendant's statements shall not be suppressed.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress [69] is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: June 24, 2013
cc/ecf: All counsel of record.